# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JEREMY TRAVON MALONE,** | ) | |
| | ) | |
| Movant/Defendant, | ) | |
| | ) | |
| **v.** | ) | **5:07-cr-00250-RDP-JEO** |
| | ) | **5:10-cv-08020-RDP-JEO** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

The cases referenced above are before the court on the motion of defendant Jeremy

Travon Malone, to vacate, set aside, or correct his conviction and sentence under 28 U.S.C. §

2255 and the amendment thereto.  (Docs. 1 & 22).[1]  Upon careful consideration, the court finds

that the motion is due to be denied.

## I.  BACKGROUND

### A.  Procedural History

On June 27, 2007, the Grand Jury issued a two-count indictment against Malone and his

co-defendant, Taurus Javier Blackburn, charging them in Count One with conspiracy to distribute

and possess with intent to distribute in excess of fifty (50) grams of cocaine base and cocaine

powder, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (c) and 846.  (07-0250 Doc. 1).  In a

second count, Blackburn individually was charged with distributing cocaine base and cocaine

powder on June 1, 2006, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and (c).  (*Id.*)  Malone

---

[1]References herein to "Doc. ___" are to the document numbers assigned by the Clerk of the Court in the present civil case (*Jeremy Travon Malone v. United States*, 5:10-cv-08020-RDP-JEO).  References herein to "07-250 Doc. ___" are to the document numbers assigned by the Clerk of the Court in the defendant's original criminal case (*United States v. Jeremy Travon Malone*, 5:07-cr-0250-RDP-JEO).

initially retained James R. Foley to represent him in this matter.  (07-250 Doc. 2; Docket Entry dated July 18, 2007).  Foley filed a motion to withdraw, which was granted, after Blackburn retained new counsel, Jerry S. Barclay.  (07-250 Doc. 19; Docket Entry dated August 7, 2007).

Mr. Barclay filed several motions for disclosure of various documents and for disclosure of prior bad act evidence (FED. R. EVID. 404(b)) from the United States.  (07-250 Docs. 20 & 21).  They were complied with.  Mr. Barclay also filed a motion to sever Malone's trial from that of his co-defendant.  (Doc. 26).  The motion to sever was denied.  (Doc. 32).  Ultimately, Malone and the United States were unable to reach a plea agreement, and the case proceeded to trial on January 7, 2008.  The jury convicted both defendants (Blackburn and Malone) as charged on January 15, 2008.  (07-250 Docs. 48 & 49).

The United States Probation Office prepared a Presentence Investigation Report ("PSR") on Malone.  (07-250 Doc. 58 (Sealed)).  Mr. Barclay filed objections to the report.  (07-150 Doc. 52).  He also filed a motion seeking the production of the drug evidence for weighing and analyzing.  (*Id*. at Doc. 53).  The motion was denied, but the court treated it as an objection to the presentence report.  (*Id*. at Docket Entry dated May 1, 2008).  On May 1, 2008, the court held a sentencing hearing.  (*Id*. at Doc. 74).  Malone was sentenced to 120 months in prison followed by 60 months of supervised release.  (*Id*. at Doc. 60 (Judgment)).

Mr. Barclay timely filed a notice of appeal on Malone's behalf.  (*Id*.  at Doc. 62).  He also filed a motion to withdraw as counsel.  (*Id*. at Doc. 65).  The motion to withdraw was granted, and new counsel, Mr. Raymond Johnson, Jr., entered a notice of appearance.  (*Id*. at Doc. 77).

On appeal, the defendant challenged (1) the sufficiency of the evidence, (2) the use of extrinsic evidence under FED. R. EVID. 404(b), (3) the allowance of evidence concerning the defendant's resisting arrest and attempting to escape, and (4) the court's excusing of a juror for

2

cause.  On August 12, 2009, the Eleventh Circuit affirmed Malone's conviction and sentence in an unpublished opinion.  (07-250 Doc. 93).  Malone did not petition the United States Supreme Court for a writ of *certiorari*.

On April 26, 2010, Malone moved to vacate his conviction and sentence pursuant to § 2255.  (Doc. 1).  Therein, he asserts that Mr. Barclay rendered ineffective assistance of counsel when Barclay (1) wrongly advised him that it "did not matter" whether Malone conspired to possess powder cocaine or cocaine base, (2) failed to file a motion to suppress the seizure of the package containing the drugs in Los Angeles, California, and (3) failed to challenge the expert testimony concerning the composition of the drugs.  (*Id*.)  The United States responded with a lengthy memorandum.  (Doc. 5).  Malone next filed a reply.  The court then determined that an evidentiary hearing would be necessary concerning the defendant's first claim – the information regarding cocaine and cocaine base.  Counsel, Brian Clark, was appointed to represent the defendant for the hearing and for filing any objections to the court's findings, if appropriate.  (Doc. Entry dated June 21, 2012).

The court conducted an evidentiary hearing on the first claim as to the events occurring prior to the trial of the case.  The defendant and Mr. Barclay testified.  The court thereafter afforded the parties an opportunity to submit briefs in support of their positions.  The parties submitted briefs.  (Docs. 19, 21, 22).

On May 6, 2013, counsel for the defendant, Mr. Clark, requested leave to withdraw from further representation of the defendant.  (Doc. 23).  The motion was denied.  Counsel remains responsible for the representation of the defendant at this juncture.

## B.  Offense Conduct

The evidence adduced at trial establishes that on June 27, 2006, the defendant mailed a

package from the Madison Lake Post Office in Huntsville, Alabama.  (Doc. 84 at 235-38).[2]  That package, bearing the defendant's name, home address, and phone number, was addressed to Taurus Blackburn in Los Angeles, California.  (Doc. 89 at 205-06).

Two days later, Postal Inspector Norbert Jaworowski of the United States Postal Service saw Taurus Blackburn enter a post office in Los Angeles carrying a white box that he thought looked suspicious because the seams of the box were taped up so as to "cover up the openings."[3] (Doc. 89 at 166, 172, and 179).  Inspector Jaworowski also noted that Blackburn "appeared to be nervous."  (*Id.* at 167).  After exiting the post office for a moment to speak with someone in a blue car bearing an Alabama license tag,[4] Blackburn returned to the post office, filled out an Express Mail label, and gave the package to the window clerk.  (*Id.* at 167-68).  Blackburn paid the shipping charges in cash.  (*Id.* at 168, 172).  Blackburn left the post office and drove away in the car with the Alabama tag.  (*Id.* at 168).

Inspector Jaworowski pulled the package from the counter line and immediately inspected the label, taking note of the addressee and the sender information on it.  (*Id.*)  His inspection revealed that the return address was non-existent.  (*Id.*)  He called the sender's telephone number only to find that the line was disconnected.  (*Id.* at 171).  The totality of these circumstances left Inspector Jaworowski "fairly certain that there was something in the box that didn't belong there."  (*Id.* at 168).

---

[2]The trial transcript is located at documents 84-86 & 89 in the criminal file (07-250).  Accordingly, references herein to the transcript are to the volume number and the transcript page number, not the electronic page number assigned by the Clerk of the Court.  The court also notes that the transcript is filed out of order in that Volume 1 is document 89 and Volumes 2-4 are at documents 84-86, respectively.

[3]The use of heavy taping to seal a package's seams is listed under the "drug package profile" used by the U.S. Postal Service.  *See United States v. Lux*, 905 F.2d 1379, 1380 n. 1 (10th Cir. 1990).  It was later determined that this package was the very same box that the defendant shipped from Huntsville to Los Angeles on June 27, 2006.  (*Id.* at 174, 203-06).

[4]The Alabama tag was registered to Blackburn.  (*Id.* at 173).

4

Jaworowski sent the package (unopened) to Postal Inspector Stephen Matthews in Birmingham, Alabama for further inspection. (*Id*. at 173). Inspector Matthews presented the package before a narcotics trained dog, who alerted to the presence of drugs inside the package. (*Id.* at 184-87). After obtaining a search warrant, Inspector Matthews opened the package and found two speakers filled with bags of what appeared to be powder cocaine, crack cocaine, and marijuana. (*Id.* at 187-95). Forensic tests conducted by Dr. Dale Forrester confirmed that the bags contained 82.37 grams of powder cocaine, 50.53 grams of cocaine base (crack), and 12.1 grams of marijuana. (07-0250 Doc. 84 at 358). Inspector Matthews testified that those quantities of cocaine and crack cocaine are typically associated with distribution (as opposed to mere personal use). (*Id.* at 327-28). He estimated that the street value of 50 grams of crack would be over $2,500 and the street value of 82 grams of powder cocaine would be about $4,000 to $4,500. (*Id.* at 330).

On July 3, 2006, Inspector Matthews arranged to have the package delivered to its intended destination. (Doc. 89 at 184, 196). The package arrived at the home of the defendant's mother,[5] who signed for the package. (*Id.* at 197). Once she took the package inside, law enforcement officers executed a search warrant at the residence. (*Id.*) Officers recovered the package and spoke with the defendant's sister, who told them that she expected the package and she knew that it was going to be in her name, but insisted that it was not supposed to be for her. (*Id.* at 199). Instead, she maintained, a man was supposed to come pick it up from her. (*Id.*) Officers also seized a computer from the defendant's mother's house. (*Id.*) Inspector Matthews also obtained a warrant to search Malone's residence, where officers seized a computer and two cell phones. (07-205 Doc. 84 at 241-42). Forensic examination of the computers seized from

_____

[5]The package was addressed to the defendant's sister, who was living with their mother at the time.

both homes revealed more than twenty (20) attempts to track the delivery of the package from Los Angeles. (*Id.* at 340-43, 345). Inspector Matthews' review of the defendant's cell phone records revealed that the defendant and Blackburn traded phone calls throughout the time the packages were in transit from Huntsville to Los Angeles and back. (*Id.* at 244).[6]

After the grand jury returned its Indictment, police officers arrested the defendant in July 2007. (*Id.* at 395-96). They told him that he was being arrested for trafficking in cocaine and inspected his car, where they found a large two-gallon vacuum-sealed bag that contained marijuana residue. (*Id.*) While the lead officer was preparing a search warrant for the defendant's home, Malone slipped out of his handcuffs, squeezed through the metal partition of the police vehicle, and drove the police car two to three miles down the street. (*Id.* at 397). The defendant abandoned the car and hid in some bushes. (*Id.*) When police dogs found him, he fought both the dogs and the officers before he was subdued and taken into custody. (*Id.* at 397). Officers then executed a search warrant at the defendant's house and found six one-gallon bags of marijuana along with smaller bags and scales in the kitchen. (*Id.* at 397-98).

Agent Jeffery Rice testified at the hearing that the defendant had a distribution amount of marijuana in the residence, valued at approximately $6,000 to $7,000. (*Id.* at 402). Agent Rice also testified that the bags and scales were indicative of drug trafficking. (*Id.*)

Malone did not testify at trial. Through his counsel, the defendant conceded that he knew Blackburn and communicated with him from time to time and that he mailed a package to Blackburn using his own name, address, and telephone number. (Doc. 89 at 157-59). However, the defendant argued that there was never any indication that his package contained contraband

___

[6]For example, on June 27, 2006, the defendant called Blackburn just a few minutes after mailing his package from Alabama to Los Angeles. (Doc. 84 at 248-50). Two days later, Blackburn and the defendant exchanged three calls around the time that Blackburn mailed the package to the defendant from Los Angeles. (*Id.* at 246-48, 250).

and pointed out that someone in California (other than the defendant) put drugs in the package addressed to his sister.  (Doc. 85 at 664-66).  Co-defendant Blackburn testified at trial.  The jury rejected Blackburn's testimony that he did not know there were drugs in the package when he shipped it from California.  They further rejected his testimony that the speakers that Malone sent to him were sent back because they did not belong to him.  The jury found both defendants guilty. Specifically, the defendant was convicted of conspiracy to possess with intent to distribute 50 grams or more of crack and 50 grams or more of cocaine.  (Doc. 86 at 720).

## II.  ANALYSIS

As noted above, Malone asserts three grounds for relief, all of which involve challenges to counsel's effectiveness at the trial level.  None of the claims have any merit.

### A.  Ineffective Assistance of Counsel

#### 1.  The Standard of Review

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Constitution, Amend. VI.  "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  The applicable standard of review in examining claims of ineffective assistance of counsel is well-settled:

> To demonstrate that counsel's assistance was so defective as to require reversal of a conviction, a defendant must show that (1) counsel's errors were so deficient as to render his assistance not reasonably effective, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694, 104 S. Ct. 2052.

*Cummings v. United States*, 202 Fed. App'x 374, 377 (11th Cir. 2006).  The Eleventh Circuit

Court of Appeals has further stated:

> The petitioner bears the burden of proof on the "performance" prong as well as the "prejudice" prong of a *Strickland* claim, and both prongs must be proved to prevail. The *Strickland* test is not easily met; as we have said, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir.1995) (*en banc*) (citation omitted).

> To establish ineffective performance, a "petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' " *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 2473, 91 L. Ed. 2d 144 (1986) (quoting *Strickland*, 466 U.S. at 668, 104 S. Ct. at 2065). This Circuit reviews a lawyer's conduct under the "performance" prong with considerable deference, giving lawyers the benefit of the doubt for "heat of the battle" tactical decisions. *See Mills v. Singletary*, 161 F.3d 1273, 1285-6 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors"); *see also Waters*, 46 F.3d at 1518 ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is ... whether what they did was within the 'wide range of reasonable professional assistance.' " (citation omitted)); *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (stating that "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate" (internal quotation marks omitted)).

> This Court, sitting *en banc*, discussed this inquiry at length in *United States v. Chandler*:

> > The standard for counsel's performance is reasonableness under prevailing professional norms. The purpose of ineffectiveness review is not to grade counsel's performance.... To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled.... The petitioner must establish that particular and identified acts or omissions of counsel were outside the wide range of professionally competent assistance.

> > Courts must indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment. Thus, counsel cannot be adjudged incompetent for

performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy.  Given the strong presumption in favor of competence, the petitioner's burden of persuasion-though the presumption is not insurmountable-is a heavy one....  [B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take....

In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time.  [I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

218 F.3d at 1313-1316 (citations and internal quotation marks omitted).

Likewise, the "prejudice" prong is difficult to meet.  To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  A finding of prejudice requires proof of " 'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.' "  *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 2582, 91 L. Ed. 2d 305 (1986)).  As we recently explained, "habeas petitioners must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'  '[T]hat the error had some conceivable effect on the outcome of the proceeding' is insufficient to show prejudice."  *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (quoting *Strickland* ).

*Johnson v. Alabama*, 256 F.3d 1156, 1175-77 (11th Cir. 2001).

It is well-settled that a court need not address both components of the ineffectiveness

inquiry if the defendant makes an insufficient showing on one.

In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed.

*Strickland*, 466 U.S. at 697.

## 2.  The Claims

### a.  Counsel's wrong advice concerning the nature of the drugs

Malone first contends that Mr. Barclay incorrectly advised him that it did not matter

whether he would be convicted for distributing powder cocaine or for distributing crack cocaine.

(Doc. 1-1 at 6).  According to Malone,

> During an attorney-client meeting at the Cullman County Jail, Movant explained
> to counsel that he was not expecting a delivery of cocaine base and proffered his
> willingness to testify to the fact that he "was expecting powder cocaine." ...
> Counsel opined that the nature and quantity of controlled substance were
> unessential to the charge because "the Government is not required to prove" either
> nature or quantity....  As a matter of law, counsel rendered erroneous advice.

(*Id*. at 7).  Based on this information, Malone asserts that he did not testify even though he told

counsel that he and Blackburn "had an agreement to possess eight (8) ounces of cocaine

hydrochloride to be distributed in Alabama," which would have justified jury instructions on a

lesser included offense.[7]  (*Id*. at 9).  But for counsel's actions, according to Malone, "the jury

could have rationally convicted [him] of the lesser conspiracy."  (*Id*. at 13).  Thus, he asserts that

he is entitled to a new trial or "an amended judgment of conviction on the lesser included offense

with a sentence between 27-41 months."  (*Id*. at 14).

Mr. Barclay disputes Malone's claim.  He states in his affidavit that

> Mr. Malone never told me, before, during or after his trial, that he knew the
> package shipped from California to his sister contained illegal drugs.  To the
> contrary, he adamantly insisted that he had no knowledge of any contents of the
> package other than stereo speakers.  He did not tell me that he wished to plead
> guilty to any offense.  He continuously maintained his complete innocence.

---

[7]Malone also asserts this would also have supported his motion for a severance.  (*Id*. at 9, n.3).

(Doc. 5-1 at ¶ 9).  Mr. Barclay also states that Malone never

> proffered [to him] that he 'was expecting powder cocaine.'  I certainly never
> 'opined that the nature and quantity of controlled substance were unessential to
> the charge ....'  I was well aware of the significant distinction between treatment
> of powder cocaine and the treatment of cocaine base under federal law, as well as
> the harsher punishments meted out for possession or distribution of larger
> quantities of drugs.

(*Id*. at ¶ 12).  Premised on the foregoing, the court deemed a hearing necessary.  Counsel was

appointed for the defendant, and a hearing was conducted.  (Doc. 16 ("Hr. Tr.")).

At the evidentiary hearing, the defendant admitted to conspiring with Blackburn to

distribute nine (9)[8] ounces of **powder cocaine**.  (*Id.* at 4-6).  He testified that he never admitted

to his attorney that he had conspired to distribute drugs.  (*Id.* at 8).  Indeed, he told the court that

he never informed his attorney that he knew there were any drugs were in the package, only that

he used the package to ship speakers.  (*Id.* at 8).  The defendant further stated that he had an

"additional agreement" with Blackburn for some "high grade marijuana" so he (the defendant)

could try it.[9]  (*Id.* at 6-7).  He also stated that he was "very reluctant to reveal certain things to

anyone ... because [he] was naive to what was going on, and [he] just didn't trust anybody at that

time."  (*Id*. at 8).  He further acknowledged that this included his attorney.  (*Id*.)

The defendant never told his counsel that he "did not agree to the cocaine base."  (*Id*. at

8).  He admitted that he never directly asked his attorney if it would matter whether he testified to

trafficking in cocaine powder or crack cocaine.  (*Id.*)  Instead, he posed a hypothetical question to

Mr. Barclay, asking what would happen if he testified that he only expected powder cocaine

rather than powder cocaine with crack cocaine.  According to the defendant, Mr. Barclay

---

[8]The volume of cocaine the defendant admitted to conspiring to distribute is at the hearing differs from the amount
the defendant alleged in his brief.  (*Compare* 10-8020 Doc. 2 at 9 with Doc. 16 at 4-5).

[9]The court notes, agents did find 12.1 grams of marijuana in the package.  (07-0250 Doc. 84 at 358).

answered that such testimony would likely not matter because he most likely would be held accountable for what was found in the package.  (*Id.* at 8-10).  The defendant complained at the hearing that this answer angered him because he already knew about the disparity in the sentences for cocaine and crack cocaine.  (*Id.* at 12).  Following this response from counsel, he decided "to not reveal anything, just plead the Fifth and go -- just say I didn't know about any drugs."  (*Id.*)  The defendant attributes his subsequent problems and ineffective representation to counsel's answer to the hypothetical question.  (*Id.* at 33-34).

On cross-examination, the defendant admitted he could not remember what he told Mr. Barclay about the speakers being sent to and from California other than what ever he said, it was not the truth.  (*Id.* at 18, 22-23, 25).  Malone also stated that he "never told him [he] was expecting anything illegal in the package."  (*Id.* at 19, 23-24).  At one point in their conversations, Malone told Mr. Barclay that he was expecting the speakers.  (*Id.* at 23).  He also told Mr. Barclay that he would not cooperate with the prosecution against Blackburn because he did not know anything about the drugs.  (*Id.* at 29).

Mr. Barclay testified that he could not recall being asked a hypothetical question by the defendant, but that he (Barclay) extensively talked with the defendant about the implications of cocaine, crack cocaine, the sentencing guidelines, and cooperating with the prosecutors.  (*See* U.S.S.G. § 5K1.1).[10]  (*Id.* at 39, 59).  The defendant told him he mailed speakers to Blackburn and Blackburn "sent speakers back to him."  (*Id.* at 41).  He believed they were "swapping" speakers.  (*Id.*)  The defendant made it clear to Mr. Barclay "at every turn that he was not expecting any contraband of any kind, no controlled substances, indicated that the had no

---

[10]Mr. Barclay's memorandum of the meeting does not reference any mention of a hypothetical.  (*Id*. at 56-57 & Gov. Ex. 2).  At one juncture, Mr. Barclay affirmatively responded when the prosecutor stated, "And your testimony today is that [a hypothetical question to him] did not happen."  (*Id*. at 58).

knowledge of anything being in the package going or coming other than the speakers themselves." (*Id.*) Mr. Barclay noted during the hearing that the defendant "was very -- always very straightforward in saying, I just never -- I did not expect any drugs." (*Id.* at 58). He never told Mr. Barclay that he wanted to admit to conspiring to possess any type of drugs. (*Id.* at 55). To the contrary, "[h]e was very consistent in saying, I did not know there were any drugs in that package." (*Id.*) Premised on the defendant's representations, counsel advanced a defense that the defendant was not involved with the drugs and did not know how they got there. (*Id.* at 42, 52). Concerning the disparity between cocaine and crack, Mr. Barclay told the defendant that "the first issue is are you guilty and can they prove it? And it is, in fact, not relevant whether it is [cocaine] powder or [cocaine base]..." under the substantive drug statute. (*Id.* at 54). *See* 21 U.S.C. § 841(a)(1). He then told the defendant, "Once you get past the matter of guilt or innocence, ... there is a huge difference in powder and base or crack cocaine," especially with regard to statutory minimum sentences. (*Id.* at 54-55).

The court finds the testimony of Mr. Barclay to be credible. It appears that the defendant was not being candid with his counsel, thus hampering his ability to represent Malone's interests. Mr. Barclay was as effective as he could be under the circumstances. He informed the defendant of the relevant substantive law, the applicable guidelines, and the prospect of cooperating in exchange for a more favorable recommendation from the prosecutor. His trial strategy was dictated, in large part, premised on the defendant's insistence that he did not know that the drugs were in the package when it was returned. Based on the representations of the defendant, counsel performed within the range expected of counsel. The choices were clearly the defendant's, and he must now accept the consequences for the same.

Furthermore, the court finds that the defendant's testimony precludes a finding of

prejudice because he acknowledged that he was aware of the sentencing disparity between cocaine and crack cocaine before he posed the hypothetical to Mr. Barclay.[11]  Thus, he cannot now argue that he was mislead by his attorney.

In sum, the court finds the defendant's first ineffective assistance of counsel claim to be without merit.

### b.  Failure to challenge the initial search of the package

Malone next contends that Mr. Barclay rendered ineffective assistance by failing to challenge the search of the package containing the drugs.  (Doc. 1-1 at 14).  Specifically, Malone contends that Jaworowski's initial seizure of the package in Los Angeles, California, was in violation of the Fourth Amendment because there was no reasonable suspicion of criminal activity to justify the seizure at that juncture.  (*Id*.)  Malone defines the operative moment as when the package was removed from the normal flow of mail and held for further investigation.  (*Id*. at 16).  He also asserts that the evidence fails to demonstrate sufficient characteristics to justify a seizure under the "drug package profile."  (*Id*.)  Lastly, he asserts that the facts of this

---

[11]The colloquy was as follows:

> COURT:        All right. When he told you what he did about you
>               asked the hypothetical --
>
> MALONE:       Yes, sir.
>
> COURT:         -- what if I was expecting just the powder --
>
> MALONE:       Yes, sir.
>
> COURT:         -- he answered that. What effect did that have on
>               you?
>
> MALONE:       It -- it was frustrating, because I knew the truth
>               of the matter. And I -- I knew how much time -- the
>               disparity of the time between crack and powder.

(*Id*. at 12).

case suggest that a motion to suppress would have been successful.  (*Id*. at 17).

The United States responds that Malone lacks standing to challenge the lawfulness of the seizure.  (Doc. 5 at 24).  The prosecution cites to *United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994), in support of its position.  They also assert that the seizure of the package was supported by reasonable suspicion.  (*Id*. at 25-27).  Malone retorts that *Smith* is inapposite, reasonable suspicion is lacking, and an evidentiary hearing on this issue is necessary.  (Doc. 7 at 9-15).

The court in *United States v. Arrendondo*, 2012 WL 1677055 (M.D. Fla. May 14, 2012), articulated relevant principles for this discussion.  The court stated:

### 1. General "Standing" Principles

A defendant may challenge the admissibility of evidence based upon a violation of the Fourth Amendment only if his own Fourth Amendment rights were violated by the challenged search or seizure.  *United States v. Padilla*, 508 U.S. 77, 81, 113 S. Ct. 1936, 123 L. Ed. 2d 635 (1993); *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).  A defendant's own Fourth Amendment rights are at issue only if defendant had a legitimate expectation of privacy in the area searched or the item seized.  *Rakas*, 439 U.S. at 139–40.  "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable."  *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir.), *cert. denied*, 555 U.S. 1014, 129 S. Ct. 569, 172 L. Ed. 2d 433 (2008).  "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable."  *United States v. Segura–Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006).  Once the issue of defendant's capacity to claim the protection of the Fourth Amendment is raised by the government, defendant has the burden of establishing his capacity.  *Rakas*, 439 U.S. at 130 n.1; *Segura–Baltazar*, 448 F.3d at 1286.  If defendant fails to do so, he may not challenge the police conduct.  *United States v. Lehder–Rivas*, 955 F.2d 1510, 1521 (11th Cir.), *cert. denied*, 506 U.S. 924, 113 S. Ct. 347, 121 L. Ed. 2d 262 (1992).

### 2. Packages In General

As a general matter, individuals do not surrender their expectations of

privacy in closed containers when they send the containers by mail or common carrier. *United States v. Van Leeuwen*, 397 U.S. 249, 251, 90 S. Ct. 1029, 25 L. Ed. 2d 282 (1970); *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *United States v. Smith*, 39 F.3d 1143, 1144 (11th Cir. 1994). Both senders and addressees of packages can reasonably expect that the government will not open the package. *United States v. Villarreal*, 963 F.2d 770, 773–74 (5th Cir. 1992) (citations omitted). Individuals may also assert a reasonable expectation of privacy in packages addressed to them under fictitious names. *United States v. Garcia–Bercovich*, 582 F.3d 1234, 1238 (11th Cir. 2009) (citing *Villarreal*, 963 F.2d at 774); *United States v. Richards*, 638 F.2d 765, 767, 770 (5th Cir. 1981). The Eleventh Circuit has noted that other circuits have held there is no legitimate expectation of privacy where defendant is neither the sender nor addressee of a letter or package. *United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994); *United States v. Banks*, 3 F.3d 399, 402 n.2 (11th Cir. 1993). In *Smith*, the Eleventh Circuit upheld a finding of no legitimate expectation of privacy in a letter where defendant was neither the sender nor addressee and gave equivocal testimony regarding his ownership interest in the letter. As was stated in *United States v. Campbell*, 434 F. App'x 805, 809 (11th Cir. 2011), "[a] defendant may have a reasonable expectation of privacy in a package even where the package is not addressed in the defendant's name, provided that he establishes a connection between himself and the addressee," citing *Richards*, 638 F.2d at 770.

In the present case, Malone did not have a legitimate expectation of privacy in the package at the time it was initially seized. In *United States v. Pierce*, 959 F.2d.1297 (5th Cir. 1992), the Fifth Circuit Court of Appeals held that where the defendant is neither the sender nor the addressee on the package, he has no privacy interest in the same. *Id.* at 1303. The court further noted that because the "only [admitted] interest in suppressing the package and its contents [was to avoid its evidentiary force against him," his Fourth Amendment claim of standing was rejected. *Id.*; *See also United States v. Parks*, 119 Fed. App'x 593, *4 (5th Cir. 2004) (same) (citing *United States v. Givens*, 733 F.2d 339, 341-42 (4th Cir. 1984); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (both holding that a defendant who was neither the sender nor the addressee of the package lacked standing to contest the legality of its search)). In the present case, the defendant was neither the sender nor the addressee. His only asserted

interest is to avoid its evidentiary force against him.  Accordingly, he does not have a legitimate expectation of privacy in the package sent by Blackburn to Malone's mother's address and addressed to his sister.

Even if standing is assumed,[12] the defendant is not entitled to any relief on his ineffectiveness claim because he cannot demonstrate that he sustained any prejudice.  Malone premises his prejudice argument, in part, on a claim that the seizure in Los Angeles was not supported by reasonable suspicion.  The United States counters that the filing of a motion to suppress would have been futile.

As noted above, the right to be free from unreasonable seizures includes one's mail.  *Van Leeuwen*, 397 U.S. at 251.  However, the Fourth Amendment is not violated by detaining mail until a search warrant can be obtained based on facts that create reasonable suspicion.  *Id.* at 252-53; *see also United States v. Banks*, 3 F.3d 399, 403 (11th Cir. 1993) (*per curium*).  To determine whether the handling of a package is supported by reasonable suspicion, the court must look to the "totality of the circumstances" "to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002).  The court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'..."  *Id.* (citations omitted).  The only relevant admonition by the *Arvizu* Court was that "an officer's reliance on a mere ' "hunch" ' is insufficient to justify a stop...."  *Id.* at 274 (citations omitted).  Counterbalancing that admonition, the Court stated that "the likelihood of criminal activity need not rise to the level

---

[12]And this is a large assumption, because, as counsel indicated at the hearing, the defendant who would have to testify regarding the package had initially told law enforcement officers that he was not "anticipating receipt of the package." (Gov. Ex. 1 at 3).

required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard....” *Id*. (citations omitted).  However, even if the initial seizure of a mailed package is valid, a continued detention could at some point become an unreasonable seizure within the meaning of the Fourth Amendment.  *Van Leeuwen*, 397 U.S. at 252, 90 S. Ct. at 1032.  The Court's discussion in *Van Leeuwen* while not directly on point, is instructive:

> The nature and weight of the packages, the fictitious return address, and the British Columbia license plates of respondent who made the mailings in this border town certainly justified detention, without a warrant, while an investigation was made.  The 'protective search for weapons' of a suspect which the Court approved in *Terry v. Ohio*, 392 U.S. 1, 20-27, 88 S. Ct. 1868, 1879-1883, 20 L. Ed. 2d 889 [(1968)], even when probable cause for an arrest did not exist, went further than we need go here.  The only thing done here on the basis of suspicion was detention of the packages.  There was at that point no possible invasion of the right 'to be secure' in the 'persons, houses, papers, and effects' protected by the Fourth Amendment against 'unreasonable searches and seizures.'  Theoretically – and it is theory only that respondent has on his side – detention of mail could at some point become an unreasonable seizure of 'papers' or 'effects' within the meaning of the Fourth Amendment.  Detention for 1 ½ hours-from 1:30 p.m. to 3 p.m. – for an investigation certainly was not excessive; and at the end of that time probable cause existed for believing that the California package was part of an illicit project.

*Van Leeuwen*, 397 U.S. at 252, 90 S. Ct. at 1032.  The Court also stated,

> No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited.  The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained.

*Id*.

The detaining officer in this case, Inspector Jaworowski, articulated particularized and objective grounds at the initial suppression hearing explaining why the package appeared suspicious.  (*See* Doc. 89 at 166-67, 171-72).  Jaworowski was an experienced postal inspector assigned to the narcotics team.  (*Id*. at 166).  He had thirty years in law enforcement, and,

according to the defendant, 9,950 successful stops of suspicious packages.[13]  The package was thoroughly sealed with tape, suggesting that the sender did not want anything inside to be detected.[14]  (*Id.*)  Blackburn appeared to be nervous as he held the package and wandered between the post office and a car with an Alabama licence plate.[15]  (*Id.*)  Blackburn paid in cash for next-day delivery.  (*Id.*)  Upon retrieving the package, Jaworowski examined the label for the addressee and sender information.  He immediately determined that the return address on the package was a fictional address and the telephone number on the label had been disconnected.[16]  (*Id.*)  Premised on this information, he secured the package and forwarded it to Postal Inspector Matthews in Birmingham.  (*Id*. at 173).

  The totality of the facts created a reasonable suspicion that the package contained contraband sufficient to justify detaining the package until a search warrant was issued.[17]  Therefore, the seizure of the package by Jaworowski did not violate the defendant's Fourth Amendment rights, and Mr. Barclay's failure to pursue a challenge to the seizure was not prejudicial to the defendant.  Nothing before the court demonstrates that the length of time the

---

[13]Jaworowski testified he had intercepted in excess of 10,000 packages that he believed were suspicious.  (Doc. 89 at 167).

[14]The package was taped "around the seams" to cover up the openings, which, in his experience, was typical of people who placed things inside a package that "didn't belong there."  (*Id*. at 168, 179-80).

[15]This was unusual in that cars with Alabama tags are not unusually seen in that parking lot.  (*Id*. at 168).

[16]He called the number and determined that the telephone was disconnected.  (*Id*. at 168).

[17]Jaworowski's actions were consistent with an evaluation of the "drug package profile" characteristics of the Postal Inspection Service cited by the court in *Lux*:

   (1) size and shape of the package; (2) package taped to close or seal all openings; (3) handwritten or printed labels; (4) unusual return name and address; (5) unusual odors coming from the package; (6) fictitious return address; and (7) destination of the package.

*Id.*, 905 F.2d at 1380, n.1.

package was in Jaworowski's possession was unreasonable.  Like the situation in *Van Leeuwen*, no interest protected by the Fourth Amendment was invaded by Jaworowski's actions.  Any privacy interest under the Fourth Amendment possessed by the defendant was not disturbed or invaded until after the search warrant was obtained and the package was opened.  Thus, any Fourth Amendment challenge to the initial seizure of the package by Jaworowski would have failed.  The defendant is entitled to no relief on this claim of ineffective assistance of counsel.

### c.  Failure to challenge the forensic evidence concerning the drugs

Lastly, Malone alleges that Mr. Barclay was ineffective in failing to challenge the evidence establishing that there was cocaine base in the package.  (Doc. 2 at 18-25).  Specifically, he challenges the testimony of Inspector Matthews, asserting that Matthews was not properly questioned concerning his assessment.  (*Id*. at 19-20).  He also challenges the testimony of the prosecution's expert, Dr. Forrester, asserting that he (Forrester) conflated the terms "crack" and "cocaine base," despite the legal differences.  (*Id*. at 18-24).  Although the defendant abandoned this claim at the evidentiary hearing, the court will address the same for completeness. (Doc. 16 at 25).

The trial testimony clearly established that "Exhibit 24" was 50.53 grams of the crack form of cocaine base.  Contrary to the defendant's assertions, Matthews was qualified to testify about his assessment, Forrester did not state that crack cocaine is the only form of cocaine base, and the evidence was sufficient to hold the defendant accountable for his conduct.  Additionally, The defendant has not produced any evidence demonstrating that the drugs were anything else.  Finally, his challenges to the cross-examination, or lack thereof, concerning Matthews and Forrester are insufficient to warrant relief.  Nothing the defendant asserts demonstrates that Forrester's methods were out-of-the-ordinary, unreliable, or subject to challenge.  To the

contrary, he used infrared spectroscopy, a well-accepted scientific testing method that can accurately identify chemical compounds, including crack cocaine.  (Doc. 2 at 32; Doc. 7 at 23-26).  There is no doubt that Dr. Forrester's technique is sound and that his conclusions are accurate.  Similarly, nothing in the record demonstrates that the testimony of Inspector Matthews was unreliable or otherwise untrustworthy.

### III.  CONCLUSION

For the foregoing reasons, Malone's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (10-8020 Doc. 1) is without merit and due to be denied.  It is so **RECOMMENDED**.

### IV.  NOTICE OF RIGHT TO OBJECT

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court.  Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.  Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the magistrate judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L. Ed. 2d 933 (1986); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*).  In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  The filing of objections generally is not a proper vehicle to make new allegations or present additional evidence.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United

21

States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.  The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

**DONE**, this the 12th day of July, 2013.

**JOHN E. OTT**
Chief United States Magistrate Judge

22